CLERK'S OFFICE
A TRUE COPY
Jul 28, 2025
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
information associated with the Instagram account (active but not limited to, May 8, 2025), theblackmentor_ (URL: www.instagram.com/theblackmentor_) (Subject Account), which is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a company headquartered at 1 Meta Way, Menlo Park, California 94025

Case No. 25-M-478 (SCD)

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the ____________ District of ____________ *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before 8-11-25 *(not to exceed 14 days)*

X in the daytime 6:00 a.m. to 10:00 p.m. ❒ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to Honorable Stephen C. Dries.
*(United States Magistrate Judge)*

❒ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❒ for ____ days *(not to exceed 30)* ❒ until, the facts justifying, the later specific date of ____________.

Date and time issued: 7-28-25. 9:40 am

Stephen C. Dries
*Judge's signature*

City and state: Milwaukee, WI

Honorable Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ____________________

____________________
*Executing officer's signature*

____________________
*Printed name and title*

# ATTACHMENT A

## Property to Be Searched

This warrant applies to information associated with the following Instagram account (active on, but not limited to, May 8, 2025), which is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a company headquartered at 1 Meta Way, Menlo Park, California:

1. **theblackmentor_ (URL: www.instagram.com/theblackmentor_) (Subject Account)**

<u>ATTACHMENT B</u>

**Particular Things to be Seized**

**I. Information to be disclosed by Meta Platforms, Inc. ("Meta")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Meta, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information to the government for each account or identifier listed in Attachment A **for the time period of January 1, 2020, through the date of this warrant for the Subject Account.**

1. All business records and subscriber information, in any form kept, pertaining to the account, including:

   a. Identity and contact information (past and current), including full name, e-mail addresses, physical address, date of birth, phone numbers, gender, hometown, occupation, websites, and other personal identifiers;

   b. All Instagram usernames (past and current) and the date and time each username was active, all associated Instagram and Facebook accounts (including those linked by machine cookie), and all records or other information about connections with Facebook, third-party websites, and mobile apps (whether active, expired, or removed);

c. Length of service (including start date), types of services utilized, purchases, and means and sources of payment (including any credit card or bank account number) and billing records;

d. Devices used to login to or access the account, including all device identifiers, attributes, user agent strings, and information about networks and connections, cookies, operating systems, and apps and web browsers;

e. All advertising information, including advertising IDs, ad activity, and ad topic preferences;

f. Internet Protocol ("IP") addresses used to create, login, and use the account, including associated dates, times, and port numbers;

g. Privacy and account settings, including change history; and

h. Communications between Meta and any person regarding the account, including contacts with support services and records of actions taken;

2. All content (whether created, uploaded, or shared by or with the account), records, and other information relating to videos (including live videos and videos on IGTV), images, stories and archived stories, past and current bios and profiles, posts and archived posts, captions, tags, nametags, comments, mentions, likes, follows, followed hashtags, shares, invitations, and all associated logs and metadata;

3. All content, records, and other information relating to communications sent from or received by the account, including but not limited to:

a. The content of all communications sent from or received by the account, including direct and group messages, and all associated multimedia and metadata, including deleted and draft content if available;

b. All records and other information about direct, group, and disappearing messages sent from or received by the account, including dates and times, methods, sources and destinations (including usernames and account numbers), and status (such as delivered, opened, replayed, screenshot);

c. All records and other information about group conversations and video chats, including dates and times, durations, invitations, and participants (including usernames, account numbers, and date and time of entry and exit); and

d. All associated logs and metadata;

4. All content, records, and other information relating to all other interactions between the account and other Instagram users, including but not limited to:

a. Interactions by other Instagram users with the account or its content, including posts, comments, likes, tags, follows (including unfollows, approved and denied follow requests, and blocks and unblocks), shares, invitations, and mentions;

b. All users the account has followed (including the close friends list), unfollowed, blocked, unblocked, muted, restricted, or denied a request to follow, and of users who have followed, unfollowed, blocked, unblocked, muted, restricted, or denied a request to follow the account;

c. All contacts and related sync information; and

d. All associated logs and metadata;

5. All records of searches performed by the account; and

6. All location information, including location history, login activity, information geotags, and related metadata.

Meta shall disclose responsive data, if any, within 14 days of the issuance of this warrant.

**II. Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 18, United States Code, Section 1343 (wire fraud), and Title 18, United States Code, Sections 1956 and 1957 (money laundering) involving Joseph Nantomah, Investors Capital LLC, Global Investors Capital LLC, High Income Performance Partners LLC, and Wealth Flow LLC, from January 1, 2020 through the date of this warrant, including, for each user ID identified in Attachment A, information, including records and communications, pertaining to the following matters:

1. Offering, soliciting, or discussing of investment opportunities;
2. Obtaining, secreting, transferring, and/or concealment of money and other assets, and the expenditure of money;
3. Personal and business accounting books and records: ledgers, journals, subsidiary ledgers, financial statements, gross receipts and income records, cash receipts and disbursements records and/or journals, sales and purchase records and/or journals, accounts receivable and payable ledgers and records, bad debt records, cost of goods sold records, loan receivable and payable ledgers, voucher register and all

sales and expense invoices including all invoices documenting expenses paid in cash or bank checks and retained copies of any bank checks, and any other handwritten summaries/notes or schedules;

4. Personal and business financial records reflecting income and expenses including: bank statements, records reflecting dates and amounts of deposits, deposit slips, records reflecting dates and amounts of withdrawals, withdrawal slips, debit and credit memos, records reflecting the identity of checks deposited, records disclosing the disposition of withdrawals, check registers, checks and deposit tickets including cash deposits, certificates of deposit, money market certificates, US Treasury notes or bills, cancelled checks (front and back), check stubs, money orders and receipts, cashier's checks, travelers checks, wire transfers, records reflecting the transfer of funds, bank notices, trust account records, brokerage account records, signature cards, foreign bank records, and any other records relating to bank accounts;
5. Business origination and creation documentation;
6. Titles to assets, real estate records, foreign real estate and other assets, travel and vacation records, IRA and 401K records, stocks and bonds records, insurance records, passbooks, wills, inheritance records, gift records, trust records, records for the purchase of precious metals, and other investment records;
7. Client records including names, address and telephone books, work orders, notes, investment agreements, contracts, transaction records including subsidiary ledgers, schedules, summaries, and other financial statements identifying clients;

8. Online storage or other remote computer storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage;
9. All evidence of who created, used, owned or controlled the Subject Account, including, records that help reveal the identity and whereabouts of such person(s);
10. Evidence indicating how and when the Subject Account were accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crimes under investigation and to the Subject Account owners;
11. Evidence indicating the Subject Account owners state of mind as it relates to the crime under investigation; and
12. The identity of the person(s) who communicated with the Subject Account about matters relating to the above-mentioned violations, including records that help reveal their whereabouts.

This warrant authorizes a review of electronically stored information, communications, other records, and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the

disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

CLERK'S OFFICE
A TRUE COPY
Jul 28, 2025
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

information associated with the Instagram account (active but not limited to, May 8, 2025), theblackmentor_ (URL: www.instagram.com/theblackmentor_) (Subject Account), which is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a company headquartered at 1 Meta Way, Menlo Park, California 94025

Case No. 25-M-478 (SCD)

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the ______ District of ______, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| Title 18, U.S.C. § 1343 | Wire Fraud |
| Title 18, U.SC. §§ 1956 and 1957 | Money Laundering |

The application is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days *(give exact ending date if more than 30 days:* ______ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

[signature]
*Applicant's signature*

Hailey Wirtz, Special Agent - FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means)*.

Date: 7-28-25

[signature]
*Judge's signature*

City and state: Milwaukee, WI

Honorable Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, HAILEY WIRTZ, being first duly sworn, hereby depose and state as follows:

## BACKGROUND AND EXPERIENCE OF AFFIANT

1. I make this affidavit in support of an application for a search warrant for information associated with a certain Instagram account that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. ("Meta"), a company headquartered at 1 Meta Way, Menlo Park, California. The Instagram account to be searched is **theblackmentor_ (URL: www.instagram.com/theblackmentor_)** ("Subject Account"), which is further described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require Meta to disclose to the government copies of the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2. I am a Special Agent of the Federal Bureau of Investigation (FBI) and have been so employed since January 2025. As a Special Agent, I've received training in complex financial crimes, including the identification, investigation, and documentation of fraudulent financial activity. This training includes instruction of how social media accounts can be utilized to support financial crime investigations and identify patterns of misconduct.

3. The statements in this affidavit are based on my personal observations, my training and experience, information obtained from other federal and state investigators, witness statements and records, other third-party records, and information published by Meta. I believe these sources of information to be credible and reliable based on the corroboration of the information and my experience with these matters. This affidavit is intended to show merely that there is sufficient

probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## JURISDICTION

4. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined in 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

5. As set forth below, there is probable cause to believe that in the Subject Account are the fruits, evidence, and instrumentalities of criminal offenses in violation of Title 18, United States Code, Section 1343 (wire fraud), and Title 18, United States Code, Sections 1956 and 1957 (money laundering) ("the Subject Offenses").

**Background of the Investigation**

6. Beginning in February 2025, the Federal Bureau of Investigations (FBI) and Internal Revenue Service, Criminal Investigation (IRS-CI) started investigating allegations that Joseph Nantomah defrauded numerous investors in a fix-and-flip real estate investment scheme between 2020 and 2024 through his companies Investors Capital LLC, Global Investors Capital LLC, High Income Performance Partners LLC, and Wealth Flow LLC. A fix-and-flip real estate investment involves investors purchasing properties in need of repair, renovating them, and then selling them for a profit. Based on the investigation to date, Nantomah solicited fix-and-flip real estate investments from individuals who attended his presentations at financial coaching classes and seminars, and through social media, including the Subject Account. Nantomah entered into

written investment agreements with investors, promising to use the invested funds to acquire properties, fix them up, flip them, and pay the investors their principal with a guaranteed return on investment on a specific date. Based on the investigation to date, Nantomah did not use the money he received to purchase properties or to fix them. Instead, Nantomah used those funds on personal expenses and Ponzi payments to prior investors.

7. During this investigation, case agents learned that the Securities and Exchange Commission (SEC) and Wisconsin Department of Financial Institutions, Bureau of Enforcement, Division of Securities (WI-DFI), have both been conducting their own multi-year investigations into Nantomah's fix-and-flip real estate investment scheme. The SEC and WI-DFI investigations have involved interviewing and gathering records from victim investors and analyzing financial records relating to Nantomah and his businesses. The SEC and WI-DFI have provided the case agents with access to their investigative files, which contain: (1) investor interview recordings, transcripts, and memorandums, (2) investor files containing records such as investment agreements, communications with Nantomah, complaints, and financial records, (3) records subpoenaed from financial institutions, and (4) bank record analysis. These investigative files are referenced throughout this affidavit.

8. During this investigation, case agents also learned that numerous victim investors from across the United States hired the Milwaukee law firm, AxePoint Law, to assist them with filing state and federal complaints against Nantomah and his businesses in Milwaukee, WI. AxePoint Law provided the case agents with their clients' filed complaints and exhibits, the recording and transcript of a deposition AxePoint Law took of Nantomah on September 19, 2024, and records subpoenaed from financial institutions. These files are referenced throughout this affidavit.

**Nantomah's Businesses**

9. Investors Capital LLC (IC) is a company Nantomah organized in the State of Wisconsin and registered with WI-DFI on March 1, 2020. WI-DFI records show that Nantomah is the registered agent and sole member of IC, and the principal office address is at 790 N Milwaukee Street, Suite 354, Milwaukee, WI 53202. In Nantomah's AxePoint Law deposition on September 19, 2024, he said the business purpose of IC was to buy and sell real estate.

10. Global Investors Capital LLC (GIC) is a company Nantomah organized in the State of Wisconsin and registered with WI-DFI on March 10, 2022. WI-DFI records show that Nantomah is the registered agent and sole member of GIC, and the principal office address is at 11220 W Burleigh Street, Wauwatosa, WI 53222. In Nantomah's AxePoint Law deposition on September 19, 2024, he said GIC was a holding company setup to hold rental real estate. He said that properties were purchased by IC and transferred to GIC if they were held for rental purposes.

11. Wealth Flow LLC (WF) is a company Nantomah organized in the State of Wisconsin and registered with WI-DFI on March 1, 2022. WI-DFI records show that Nantomah is the registered agent and sole member of WF, and the principal office address is at 11220 W Burleigh Street, Suite 100, Wauwatosa, WI 53222. In Nantomah's AxePoint Law deposition on September 19, 2024, he said it is his company that he used for seminars, conferences, and boot camps, to teach people how to acquire profitable real estate, how to build wealth through real estate, setting up LLCs, and building business credit. Nantomah said they would scout properties during WF classes and he would do real estate deals with individuals from the WF classes.

12. High Income Performance Partners LLC (HIPP) is a company Nantomah organized in the State of Wisconsin and registered with WI-DFI on July 14, 2023. WI-DFI records show that Nantomah is the registered agent and the principal office address is at 11220 W Burleigh

Street, Wauwatosa, WI 53222. In Nantomah's AxePoint Law deposition on September 19, 2024, he said HIPP was created to differentiate between the students and partners who took the WF class. Nantomah said HIPP was created as an education class for partners who had real estate experience and were willing to move forward with investments, while the students with no real estate experience were part of the WF class.

**Financial Analysis of Investments**

13. During this investigation, case agents analyzed multiple personal and business bank account records pertaining to accounts controlled by Nantomah. These account records were obtained through subpoena and through the WI-DFI and SEC. Case agents also analyzed numerous investment agreements, complaints, and interview records obtained from the WI-DFI, SEC, and AxePoint Law. These records show that from approximately May 4, 2020 until January 12, 2024, at least 32 individuals and businesses invested at least $1,929,000 with IC, GIC, and HIPP. The bank account records show Nantomah used a significant amount of these funds for a variety of expenditures unrelated to the purchase, renovation, and sale of properties as promised in the investment agreements. Instead, Nantomah spent a significant amount of these funds at companies associated with the sale of vehicles, boats, jewelry, golden visa and other residency and citizenship programs, travel, and for large American Express credit card payments for apparent lavish personal expenses including travel and jewelry, among other things.

**Investment Property at 3985 Fairfield Road, Slinger, Wisconsin 53086**

14. In May and June 2023, four individuals, identified herein as Investor 1, Investor 2, Investor 3, and Investor 4, invested a combined $290,000 with IC to fix-and-flip a residential property at 3985 Fairfield Road, Slinger, Wisconsin 53086. AxePoint Law represents these

investors. AxePoint Law provided records showing each of these investors entered into Investment Agreements with IC. The Investment Agreements state, in part, that IC was to use the invested funds specifically for the fixing and flipping of the property located at 3985 Fairfield Road, Slinger, Wisconsin 53086. The Investment Agreements guaranteed each investor the return of their principal plus a return on investment of either 10% or 20% in 8 months.

15. Records subpoenaed from Navy Federal Credit Union (NFCU) show each of these investors transferred funds to NFCU account ending 5223 in the name of IC (IC account ending 5223). The account application and signature card for IC account ending 5223, dated April 15, 2022, list Nantomah as the 100% owner of IC and the sole signor on the account. The investor transfers, which match the amounts in each investor's Investment Agreement, are as follows:

a. Investor 1 transferred $50,000 on May 29, 2023.

b. Investor 2 transferred $100,000 on May 30, 2023.

c. Investor 3 transferred $80,000 on June 5, 2023.

d. Investor 4 transferred $25,000 on June 5, 2023, $25,000 on June 7, 2023, and $10,000 on June 12, 2023, for a total of $60,000.

16. On July 14, 2025, AxePoint Law Attorney Kate Goodhart confirmed that to date, Investor 1, Investor 2, Investor 3, and Investor 4 have not received any return on investment or any return of their principal, which was guaranteed to be paid in 8 months.

17. An analysis of IC account ending 5223 shows no real-estate related transactions involving 3985 Fairfield Road, Slinger, Wisconsin 53086. Instead, between May 31, 2023 and June 8, 2023, $270,000, primarily consisting of these investors' funds, was transferred via check and cashier's check from IC account ending 5223 to IC's account ending 2175 at Landmark Credit Union (IC account ending 2175). Records subpoenaed from Landmark Credit Union show the

certificate of beneficial owners for IC account ending 2175, dated March 5, 2022, list Nantomah as the account owner with a 99% controlling interest. A minor named Nana Nantomah is also listed as a signor on the account with a 1% controlling interest.

18. The funds transferred to IC account ending 2175 were used for a variety of expenditures including what appears to be personal expenses, cash withdrawals, large American Express credit card bill payments for what appear to be lavish travel and other personal expenses, and to pay back previous investors.

19. Washington County records show that neither Nantomah nor any of his businesses have ever held an ownership interest in 3985 Fairfield Road, Slinger, Wisconsin 53086. Washington County warranty deed records show that Jeffrey and Karoline Rehm jointly owned the property with Spencer and Sharon Nygaard from March 18, 2005, to September 14, 2023, at which point they sold it to the Collison Revocable Trust. As detailed below, this Trust is not associated with Nantomah or any of his businesses.

20. On July 16, 2025, a case agent interviewed Jeffrey Rehm. Rehm stated that he previously owned and lived at the property located at 3985 Fairfield Road in Slinger, Wisconsin. Rehm stated that he signed a contract with a man with initials V.M. to sell the house sometime in May, June, or July 2023. V.M. was looking for investors to help buy the property and a man named Joseph was one of the potential investors. V.M. had three contractors bid on work that was needed at the Slinger house. Joseph was one of the contractors who was allowed to walk through the house. Over the course of a couple of days there were a lot of people in and out of the house. Joseph went to the Slinger house twice. The first time he was alone and the second time he was with another guy and they toured the house. Joseph backed out of the investment and V.M. could not find another investor, so Rehm moved on from the contract. Rehm never received any funds

from V.M. or Joseph for the purchase of 3985 Fairfield Road in Slinger, Wisconsin. Rehm hired a realtor and quickly sold the house to a family trust with absolutely no association to V.M. or Joseph.

21. On April 29, 2025, a case agent surveilled publicly available information on the Subject Account. The profile name displayed on the Subject Account is DrJoseph James Nantomah. The review of the Subject Account shows that Nantomah has been using this account to advertise his businesses and investment opportunities. The case agent used specialized software to video record the posts viewed on the Subject Account. As part of the surveillance, the case agent recorded two video posts, one from June 2, 2023, and one from June 3, 2023. These videos show Nantomah and Investor 1[1] discussing and visiting a fix-and-flip investment property. The following summarizes information and statements from these videos:

a. The first video was posted on June 2, 2023. This video shows Nantomah and Investor 1 standing in a building and talking. The following statements were made in part during the video:

**INVESTOR 1:** I invested in the deal. So, you you don't want to let deals go by like that.

**NANTOMAH:** Yeah, so that deal that we are talking about…the one in Slinger that I um uh got for 665. We'll put in 35…or is it 25 to fix it, and we're selling 850. He's on that deal.

**INVESTOR 1:** Right

**NANTOMAH:** And uh we're gonna be finishing that deal. That is gonna start this month in June and I wanted him to come and see it for himself.

---

[1] The case agents reviewed Investor 1's driver's license photograph and confirmed this individual is Investor 1.

*BREAK*

**NANTOMAH:** So we're going to see the deal. We're going in there. Everybody is waiting there. My contractor everybody is gonna be there. We'll probably do a live there and you can tell them your experience…You got anything you want to say before I go?

**INVESTOR 1:** Let's go people. Let's go make the money.

b. The second video was posted on June 3, 2023. This video shows Nantomah and Investor 1 walking around the exterior of 3985 Fairfield Road, Slinger, Wisconsin 53086[2] and then entering the house and walking around the interior. The post reads, "Last chance to be on this amazing deal we closing this June. Property on contract for $665,000 / Repairs $35,000 / Selling or ARV on paper is $831,000 might be more / Profit $131,000 before closing. DM the word DEAL or email Info@investorscapitalllc.net."

22. On October 9, 2024, Investor 1 was interviewed by the SEC pursuant to their investigation. The following is a partial summary of the statements Investor 1 made during the interview:

a. Investor 1 initially saw Nantomah on Instagram and reached out to him. Investor 1 believed that Nantomah was a reputable person. So, he told him that he would love to talk with him as he was thinking of investing in real estate and was looking for a mentor. Nantomah told Investor 1 that he couldn't be his mentor at that time and instead sent him an invitation for the Wealth Flow (WF) conference in Milwaukee. Since Investor 1 had another commitment, he didn't attend the WF conference.

[2] On July 17, 2025, a case agent showed Jeffrey Rehm this video and Rehm confirmed that the property in the video is his previous property at 3985 Fairfield Road, Slinger, Wisconsin 53086. Rehm also confirmed that the white male shaking Nantomah's hand inside the house is Rehm.

b. A year later, Nantomah travelled to Baltimore. So, Investor 1 took the opportunity to meet him in person and, they had a one-on-one meeting. During the meeting, Nantomah had called someone over the phone and asked the person to prequalify Investor 1 for a loan. Nantomah gave Investor 1 a paper detailing this prequalification, which was for a $2 million loan. Nantomah had asked Investor 1 how much money he had. When Nantomah heard Investor 1 had $50,000 to invest, he told Investor 1 that it wasn't enough to invest on his own and recommended that he invest with Investors Capital, LLC (IC) to build up his portfolio. A week later, Nantomah sent Investor 1 what's app messages with details of an investment property located at 3985 Fairfield Rd, Slinger, Wisconsin. Nantomah wanted Investor 1 to invest in the property with him.

c. Nantomah told Investor 1 that investing with IC was a great investment opportunity because you are buying, fixing, and then flipping properties for profit. Investor 1 didn't have any reason to doubt him. When Investor 1 initially received the investment contract from Nantomah, he shared it with his attorney who suggested a few changes. When approached with these changes, Nantomah became mad.

d. On May 25, 2023, Investor 1 signed an investment agreement with IC and wired $50,000 from his Navy Federal Credit Union (NFCU) account. Investor 1 retained a receipt of this payment. The terms of the agreement stated that Investor 1 would receive a 20% return on his investment to be repaid in eight months. Nantomah told Investor 1 that he was going to use the money invested with IC to fix up and flip the property located at 3985 Fairfield Road, Slinger, Wisconsin. Investor 1 said that at the time he didn't know that other people had also invested in the property. After the investment matured and his

money came due, Investor 1 found out that Doctor N., a Texan doctor, had also invested in the same property.

e. Investor 1 said that he has a very retentive memory, and he vividly recalled his visit to Milwaukee to view the investment property located at 3985 Fairfield Rd, Slinger, Wisconsin. Investor 1 flew to Milwaukee from Maryland. Once on the ground, he rode in Nantomah's car to the property. Investor 1 recalled that the reason why the property was being sold was because a white man and his wife were retiring. According to Nantomah, the husband told Nantomah to sell their property because they were going on a cruise. When they arrived at the property, they were met by a white man and his wife who acted like the owners of the property and appeared to be in their mid-60's. In the house, there was live video set up to record the visit. During this walk-through, Nantomah had asked Investor 1 about his reaction to the property. The video recording of their discussion was then posted to Nantomah's Instagram page.

f. Investor 1 was subsequently contacted by P.A. via What's app when it was discovered that they had both invested in the same property. P.A., an investor out of New York, had seen the video of Nantomah and Investor 1 and, based on that video, decided to invest. P.A. saw that Investor 1 was a preacher, which also influenced his decision to invest. When Investor 1 heard this, he said that it pained his heart because he was unintentionally involved in someone else investing with Nantomah.

g. Investor 1 discussed communications he had with Nantomah when his contract came due on January 2, 2024. Investor 1 had called and texted Nantomah but all he received were excuses why Nantomah couldn't return his funds. For example, Nantomah said that his NFCU account had been closed because he was doing so many

transactions, which caused the initial delay in repaying Investor 1. In February 2024, Investor 1 reached out to Nantomah who told him that he (Nantomah) was going to Vegas the week of the Superbowl. He told Investor 1 that he would call him in a week and at that time repay his funds with interest. On March 31, 2024, Easter Sunday, Nantomah called Investor 1 at around 8:00 p.m. During that phone call, Nantomah told Investor 1 that he saw a house in Florida, and it was such a good deal that "Even his enemy would have advised him to buy the property." Allegedly, Nantomah had invested Investor 1's money in this house. Nantomah told him that the family wanted to sell the property and they needed cash. Instead of paying Investor 1 back he reinvested his funds. Nantomah told Investor 1 to give him a call in one month and at that time, he would repay his money. When Investor 1 called him the following month, Nantomah wouldn't answer the call. Investor 1 subsequently tried reaching Nantomah over the next several months but, Nantomah didn't pick up. Investor 1 called Nantomah for the last time on June 19, 2024. When he couldn't reach Nantomah, he filed the lawsuit the following day through his attorney, Goodhart.

h. Investor 1 explained that he was not okay with Nantomah's practices including the investment of his funds in other properties. Nantomah never repaid Investor 1.

23. On January 4, 2024, Investor 2 was interviewed by the WI-DFI pursuant to their investigation. The following is a partial summary of the statements Investor 2 made during the interview:

a. Investor 2 learned about Nantomah when someone Investor 2 knows on Instagram posted about him. The post was about a property Nantomah had. Nantomah

was looking for people to invest in the property with him and he talked about how much you could make. Investor 2 reached out to Nantomah in May, and Nantomah told Investor 2 about the property in Slinger. Investor 2 and Nantomah scheduled a call during which Nantomah shared the details of the property and the investment. Nantomah said multiple people would invest together in the property. Nantomah charged Investor 2 $500 for the hour-long call.

b. Investor 2 decided to invest $100,000 in the Slinger property. Investor 2 paid Nantomah $100,000 on May 30th[3]. Nantomah gave Investor 2 paperwork for the property investment and the agreement stated that Investor 2 would receive a 10% return on investment in eight months. Nantomah told Investor 2 that the turnaround to sell a property will usually be about six months max but added two months to the agreement to provide a buffer period. However, the agreement to pay back Investor 2's investment in eight months was not contingent on the sale of the property. Nantomah told Investor 2 he/she would be paid back by January 2.

c. Investor 2 believed that there were three investors in the Slinger property: Investor 2, Nantomah, and another individual. The other individual was a male pastor in Maryland, but Investor 2 could not recall his name. Investor 2 believed they were investing their funds to purchase the property, renovate it, and then put it back on the market to be sold. Investor 2 believed his/her funds were to be used for the purchase of the property, while Nantomah's funds were to be used for the purchase of the property and the renovations. Investor 2 would not have consented for his/her $100,000 investment to be

[3] Based on financial records subpoenaed from Navy Federal Credit Union, this transaction occurred on May 30, 2023.

used for anything besides the purchase of this property. The property was to be bought in the name of Investors Capital.

d. On June 7, Investor 2 went to Wisconsin to see the property. Nantomah took Investor 2 to the property with his contractor and the couple who owned it. The owners were still living there at the time and showed them around. They toured the property and talked about how much it was going to cost.

e. In approximately December, Investor 2 had researched the Slinger property and discovered that it was sold in September and that Nantomah was neither the seller nor buyer. Investor 2 wrote Nantomah an email asking about the status of the investment property and if it had sold. Nantomah told Investor 2 he would tell him/her when it's ready. Investor 2 questioned Nantomah about why they don't know the status in December when the investment return was due January 2. Nantomah said if Investor 2 did not like his response, he/she can go ahead and sue or wait. He said he would tell Investor 2 when he is ready. Nantomah said he will pay Investor 2 his/her money, but Investor 2 will not be the one to make him pay. This was the last time Investor 2 spoke with Nantomah.

f. Investor 2 never received any funds from Nantomah.

24. On March 22, 2024, Investor 3 was interviewed by the WI-DFI pursuant to their investigation. The following is a partial summary of the statements Investor 3 made during the interview:

a. Investor 3 learned about Nantomah through Daddy Freeze's Instagram Live show. Nantomah was frequently on Daddy Freeze's live shows that Investor 3 watched. Nantomah paid Daddy Freeze to be on these shows.

b. In June 2023, after Investor 3 watched several videos Nantomah posted to his Instagram page about a property investment in Slinger, Investor 3 direct messaged Nantomah on Instagram about the property. Subsequently, Nantomah called Investor 3, and they discussed the property investment. The property was located at 3985 Fairfield Rd, Slinger, Wisconsin. Nantomah said he was going to sell the property in six months, but he would put seven months in the contract and the return on investment would be 20%. Investor 3 agreed to invest and Nantomah sent him/her the contract on WhatsApp. Investor 3 reviewed the contract, signed it, and sent it back to Nantomah. Then, Investor 3 wire transferred $80,000 to Nantomah for the investment. The investment plus the return on investment, totaling $96,000, was due to Investor 3 on February 5, 2024. Investor 3 believed his/her investment in 3985 Fairfield Rd, Slinger, Wisconsin, was to be used for the property to be repaired and resold. Investor 3 would not have consented in any way for his/her funds to be used for any other purpose than the purchase, rehabilitation, or sale of this property.

c. On February 5, 2024, at noon, Investor 3 contacted Nantomah and Nantomah asked him/her to forward him the contract. Investor 3 forwarded Nantomah the contract, said it is due, and asked when Nantomah would be paying. Nantomah asked Investor 3 to validate his/her account, which he/she did. Nantomah said he was working on the transaction and would get back to Investor 3. Nantomah never completed the transaction. Investor 3 followed up with Nantomah multiple times regarding the payment and Nantomah always blamed the bank for having issues.

d. The last time Investor 3 spoke with Nantomah about his overdue investment was during a video call they had. Nantomah was showing Investor 3 that he was in Chase

Bank and said the banker told him it would take five to seven working days to transfer the funds. Immediately after Nantomah said this, the banker said that was not what he/she said. Nantomah quickly cut in and said he would call back. Seven days later, Investor 3 tried to contact Nantomah about the funds, but Nantomah did not respond. Investor 3 sent Nantomah emails and called him and Nantomah did nothing.

**Examples of Additional Posts on the Subject Account**

25. On July 24, 2025, during a surveillance of publicly available information on the Subject Account, a case agent viewed multiple additional posts in which Nantomah solicited real-estate investments and exuded wealth and success. In my training and experience, when an individual exudes wealth and success, it entices others to invest with that individual. The following are examples of posts on the Subject Account, which solicit investment and exude wealth and success:

a. A video was posted to the Subject Account on June 2, 2023. This video shows a box containing multiple watches and a gold colored chain. A caption on the video states, "Your House in Lekki is in my box." The post reads, "Working with the right people is key and paramount to success. Guess the right amount and win!"

b. A picture was posted to the Subject Account on June 4, 2023. The picture shows Nantomah sitting on a couch with numerous large stacks of what appear to be $100 bills and two boxes containing multiple watches. The post reads, "You don't have to "Fake it until you make it" Just make it by working hard and choosing the right people."

c. A video was posted to the Subject Account on September 19, 2023. This video shows Nantomah at an unknown residence. A caption on the video states, "Latest

Deal Update Fix & Flip, Price $140,000 / Fixing $60,000 / ARV $260,000 / Profit after closing $55,000." The post reads, "DM[4] Fix & Flip to be Part of this deal."

d. A video was posted to the Subject Account on December 12, 2023. This video shows Nantomah at an unknown residence. A caption on the video states, "Oklahoma Fix and Flip Foreclosure Purchased $20,000 (Paid) Fixing $100,000 ARV $230,000 Profit $110,000." The post reads, "To be part of this deal email Info@Investorscapitalllc.net or DM."

## BACKGROUND CONCERNING INSTAGRAM[5]

26. Instagram is a service owned by Meta, a United States company and a provider of an electronic communications service as defined by 18 U.S.C. §§ 3127(1) and 2510. Specifically, Instagram is a free-access social networking service, accessible through its website and its mobile application, that allows subscribers to acquire and use Instagram accounts, like the target account(s) listed in Attachment A, through which users can share messages, multimedia, and other information with other Instagram users and the general public.

27. Meta collects basic contact and personal identifying information from users during the Instagram registration process. This information, which can later be changed by the user, may include the user's full name, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, credit card or bank account number, and other personal identifiers. Meta keeps records of changes made to this information.

---

[4] Based on my training and experience, I am aware that DM stands for a direct message on social media platforms.

[5] The information in this section is based on information published by Meta on its Instagram website, including, but not limited to, the following webpages: "Privacy Policy," https://privacycenter.instagram.com/policy/; "Information for Law Enforcement," https://help.instagram.com/494561080557017; and "Help Center," https://help.instagram.com.

28. Meta also collects and retains information about how each user accesses and uses Instagram. This includes information about the Internet Protocol ("IP") addresses used to create and use an account, unique identifiers and other information about devices and web browsers used to access an account, and session times and durations.

29. Each Instagram account is identified by a unique username chosen by the user. Users can change their usernames whenever they choose but no two users can have the same usernames at the same time. Instagram users can create multiple accounts and, if "added" to the primary account, can switch between the associated accounts on a device without having to repeatedly log-in and log-out.

30. Instagram users can also connect their Instagram and Facebook accounts to utilize certain cross-platform features, and multiple Instagram accounts can be connected to a single Facebook account. Instagram accounts can also be connected to certain third-party websites and mobile apps for similar functionality. For example, an Instagram user can "tweet" an image uploaded to Instagram to a connected Twitter account or post it to a connected Facebook account, or transfer an image from Instagram to a connected image printing service. Meta maintains records of changed Instagram usernames, associated Instagram accounts, and previous and current connections with accounts on Meta and third-party websites and mobile apps.

31. Instagram users can "follow" other users to receive updates about their posts and to gain access that might otherwise be restricted by privacy settings (for example, users can choose whether their posts are visible to anyone or only to their followers). Users can also "block" other users from viewing their posts and searching for their account, "mute" users to avoid seeing their posts, and "restrict" users to hide certain activity and prescreen their comments. Instagram also

allows users to create a "close friends list" for targeting certain communications and activities to a subset of followers.

32. Users have several ways to search for friends and associates to follow on Instagram, such as by allowing Meta to access the contact lists on their devices to identify which contacts are Instagram users. Meta retains this contact data unless deleted by the user and periodically syncs with the user's devices to capture changes and additions. Users can similarly allow Meta to search an associated Facebook account for friends who are also Instagram users. Users can also manually search for friends or associates.

33. Each Instagram user has a profile page where certain content they create and share ("posts") can be viewed either by the general public or only the user's followers, depending on privacy settings. Users can customize their profile by adding their name, a photo, a short biography ("Bio"), and a website address.

34. One of Instagram's primary features is the ability to create, edit, share, and interact with photos and short videos. Users can upload photos or videos taken with or stored on their devices, to which they can apply filters and other visual effects, add a caption, enter the usernames of other users ("tag"), or add a location. These appear as posts on the user's profile. Users can remove posts from their profiles by deleting or archiving them. Archived posts can be reposted because, unlike deleted posts, they remain on Meta's servers.

35. Users can interact with posts by liking them, adding or replying to comments, or sharing them within or outside of Instagram. Users receive notification when they are tagged in a post by its creator or mentioned in a comment (users can "mention" others by adding their username to a comment followed by "@"). An Instagram post created by one user may appear on

the profiles or feeds of other users depending on a number of factors, including privacy settings and which users were tagged or mentioned.

36. An Instagram "story" is similar to a post but can be viewed by other users for only 24 hours. Stories are automatically saved to the creator's "Stories Archive" and remain on Meta's servers unless manually deleted. The usernames of those who viewed a story are visible to the story's creator until 48 hours after the story was posted.

37. Instagram allows users to broadcast live video from their profiles. Viewers can like and add comments to the video while it is live, but the video and any user interactions are removed from Instagram upon completion unless the creator chooses to send the video to IGTV, Instagram's long-form video app.

38. Instagram Direct, Instagram's messaging service, allows users to send private messages to select individuals or groups. These messages may include text, photos, videos, posts, videos, profiles, and other information. Participants to a group conversation can name the group and send invitations to others to join. Instagram users can send individual or group messages with "disappearing" photos or videos that can only be viewed by recipients once or twice, depending on settings. Senders can't view their disappearing messages after they are sent but do have access to each message's status, which indicates whether it was delivered, opened, or replayed, and if the recipient took a screenshot. Instagram Direct also enables users to video chat with each other directly or in groups.

39. Instagram offers services such as Instagram Checkout and Facebook Pay for users to make purchases, donate money, and conduct other financial transactions within the Instagram platform as well as on Facebook and other associated websites and apps. Instagram collects and

retains payment information, billing records, and transactional and other information when these services are utilized.

40. Instagram has a search function which allows users to search for accounts by username, user activity by location, and user activity by hashtag. Hashtags, which are topical words or phrases preceded by a hash sign (#), can be added to posts to make them more easily searchable and can be "followed" to generate related updates from Instagram. Meta retains records of a user's search history and followed hashtags.

41. Meta collects and retains location information relating to the use of an Instagram account, including user-entered location tags and location information used by Meta to personalize and target advertisements.

42. Meta uses information it gathers from its platforms and other sources about the demographics, interests, actions, and connections of its users to select and personalize ads, offers, and other sponsored content. Meta maintains related records for Instagram users, including information about their perceived ad topic preferences, interactions with ads, and advertising identifiers. This data can provide insights into a user's identity and activities, and it can also reveal potential sources of additional evidence.

43. In some cases, Instagram users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

44. For each Instagram user, Meta collects and retains the content and other records described above, sometimes even after it is changed by the user (including usernames, phone numbers, email addresses, full names, privacy settings, email addresses, and profile bios and links).

45. As explained herein, evidence of who was using Instagram and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

46. The stored communications and files connected to an Instagram account may provide direct evidence of the offenses under investigation. Based on my training and experience, instant messages, voice messages, photos, videos, and documents] are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

47. In addition, the user's account activity, logs, stored electronic communications, and other data retained by Meta can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, [[messaging logs, photos, and videos (and the data associated with the foregoing, such as date and time)]] may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows

investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

48. Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

49. Other information connected to the use of Instagram may lead to the discovery of additional evidence. For example, associated and linked accounts, stored communications, photos, and videos may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition, stored communications, contact lists, photos, and videos can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

50. Therefore, Meta's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Instagram. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## CONCLUSION

51. Based on the foregoing, I request that the Court issue the proposed search warrant.

52. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Meta. Because the warrant will be served on Meta, who will then compile the

requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the following Instagram account (active on, but not limited to, May 8, 2025), which is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a company headquartered at 1 Meta Way, Menlo Park, California:

1. **theblackmentor_ (URL: www.instagram.com/theblackmentor_) (Subject Account)**

# ATTACHMENT B

## Particular Things to be Seized

**I. Information to be disclosed by Meta Platforms, Inc. ("Meta")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Meta, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information to the government for each account or identifier listed in Attachment A **for the time period of January 1, 2020, through the date of this warrant for the Subject Account.**

1. All business records and subscriber information, in any form kept, pertaining to the account, including:

    a. Identity and contact information (past and current), including full name, e-mail addresses, physical address, date of birth, phone numbers, gender, hometown, occupation, websites, and other personal identifiers;

    b. All Instagram usernames (past and current) and the date and time each username was active, all associated Instagram and Facebook accounts (including those linked by machine cookie), and all records or other information about connections with Facebook, third-party websites, and mobile apps (whether active, expired, or removed);

c. Length of service (including start date), types of services utilized, purchases, and means and sources of payment (including any credit card or bank account number) and billing records;

d. Devices used to login to or access the account, including all device identifiers, attributes, user agent strings, and information about networks and connections, cookies, operating systems, and apps and web browsers;

e. All advertising information, including advertising IDs, ad activity, and ad topic preferences;

f. Internet Protocol ("IP") addresses used to create, login, and use the account, including associated dates, times, and port numbers;

g. Privacy and account settings, including change history; and

h. Communications between Meta and any person regarding the account, including contacts with support services and records of actions taken;

2. All content (whether created, uploaded, or shared by or with the account), records, and other information relating to videos (including live videos and videos on IGTV), images, stories and archived stories, past and current bios and profiles, posts and archived posts, captions, tags, nametags, comments, mentions, likes, follows, followed hashtags, shares, invitations, and all associated logs and metadata;

3. All content, records, and other information relating to communications sent from or received by the account, including but not limited to:

a. The content of all communications sent from or received by the account, including direct and group messages, and all associated multimedia and metadata, including deleted and draft content if available;

b. All records and other information about direct, group, and disappearing messages sent from or received by the account, including dates and times, methods, sources and destinations (including usernames and account numbers), and status (such as delivered, opened, replayed, screenshot);

c. All records and other information about group conversations and video chats, including dates and times, durations, invitations, and participants (including usernames, account numbers, and date and time of entry and exit); and

d. All associated logs and metadata;

4. All content, records, and other information relating to all other interactions between the account and other Instagram users, including but not limited to:

a. Interactions by other Instagram users with the account or its content, including posts, comments, likes, tags, follows (including unfollows, approved and denied follow requests, and blocks and unblocks), shares, invitations, and mentions;

b. All users the account has followed (including the close friends list), unfollowed, blocked, unblocked, muted, restricted, or denied a request to follow, and of users who have followed, unfollowed, blocked, unblocked, muted, restricted, or denied a request to follow the account;

c. All contacts and related sync information; and

d. All associated logs and metadata;

5. All records of searches performed by the account; and

6. All location information, including location history, login activity, information geotags, and related metadata.

Meta shall disclose responsive data, if any, within 14 days of the issuance of this warrant.

## II. Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 18, United States Code, Section 1343 (wire fraud), and Title 18, United States Code, Sections 1956 and 1957 (money laundering) involving Joseph Nantomah, Investors Capital LLC, Global Investors Capital LLC, High Income Performance Partners LLC, and Wealth Flow LLC, from January 1, 2020 through the date of this warrant, including, for each user ID identified in Attachment A, information, including records and communications, pertaining to the following matters:

1. Offering, soliciting, or discussing of investment opportunities;
2. Obtaining, secreting, transferring, and/or concealment of money and other assets, and the expenditure of money;
3. Personal and business accounting books and records: ledgers, journals, subsidiary ledgers, financial statements, gross receipts and income records, cash receipts and disbursements records and/or journals, sales and purchase records and/or journals, accounts receivable and payable ledgers and records, bad debt records, cost of goods sold records, loan receivable and payable ledgers, voucher register and all

sales and expense invoices including all invoices documenting expenses paid in cash or bank checks and retained copies of any bank checks, and any other handwritten summaries/notes or schedules;

4. Personal and business financial records reflecting income and expenses including: bank statements, records reflecting dates and amounts of deposits, deposit slips, records reflecting dates and amounts of withdrawals, withdrawal slips, debit and credit memos, records reflecting the identity of checks deposited, records disclosing the disposition of withdrawals, check registers, checks and deposit tickets including cash deposits, certificates of deposit, money market certificates, US Treasury notes or bills, cancelled checks (front and back), check stubs, money orders and receipts, cashier's checks, travelers checks, wire transfers, records reflecting the transfer of funds, bank notices, trust account records, brokerage account records, signature cards, foreign bank records, and any other records relating to bank accounts;
5. Business origination and creation documentation;
6. Titles to assets, real estate records, foreign real estate and other assets, travel and vacation records, IRA and 401K records, stocks and bonds records, insurance records, passbooks, wills, inheritance records, gift records, trust records, records for the purchase of precious metals, and other investment records;
7. Client records including names, address and telephone books, work orders, notes, investment agreements, contracts, transaction records including subsidiary ledgers, schedules, summaries, and other financial statements identifying clients;

8. Online storage or other remote computer storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage;
9. All evidence of who created, used, owned or controlled the Subject Account, including, records that help reveal the identity and whereabouts of such person(s);
10. Evidence indicating how and when the Subject Account were accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crimes under investigation and to the Subject Account owners;
11. Evidence indicating the Subject Account owners state of mind as it relates to the crime under investigation; and
12. The identity of the person(s) who communicated with the Subject Account about matters relating to the above-mentioned violations, including records that help reveal their whereabouts.

This warrant authorizes a review of electronically stored information, communications, other records, and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the

disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.